UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :    Case No.: 1:22-cr-34 (RBW) |
| v. | : |
| | :    18 U.S.C. § 111(a)(1) and (b) |
| AIDEN HENRY BILYARD | : |
| | : |
| Defendant. | : |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Aiden Henry Bilyard, with the concurrence of his attorneys, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint

session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Aiden Henry Bilyard's Participation in the January 6, 2021 Capitol Riot*

8. The defendant, Aiden Henry Bilyard, lives in Cary, North Carolina. During the morning of January 6, 2021, the defendant traveled from North Carolina to Washington, D.C., by automobile. The purpose of the defendant's trip to Washington, D.C., was to protest Congress's certification of the Electoral College.

9. The defendant attended the former President's "Stop the Steal" rally on the Ellipse and then marched with other protestors to the Capitol.

10. At approximately 2:35 p.m. on January 6, 2021, Bilyard stood with a crowd of rioters in a restricted area, the Upper West Plaza of the U.S. Capitol grounds. He carried a gold-colored canister of "home defense pepper gel."

11. Bilyard pointed the nozzle of the canister at a line of officers who were attempting to prevent the rioters from proceeding further toward the Capitol Building. Bilyard then

discharged an orange-colored liquid spray containing a chemical agent – a deadly or dangerous weapon – toward the group of officers, which included Metropolitan Police Department Officers L.H. and C.W.

12. Immediately after the defendant sprayed the chemical agent toward the line of officers, he and his fellow rioters overwhelmed the police line, causing the officers to retreat through a stairwell to the Lower West Terrace and then into a tunnel leading into the Capitol Building.

13. The defendant took the same set of stairs to the Lower West Terrace, near the stage built for the inauguration. At or around 4:10 p.m., the defendant stood with a large group of people who gathered in front of a glass window of the Capitol Building, to the left (north) of a tunnel leading into the Building. The window led to Senate Terrace Mezzanine Room 2.

14. At one point, the defendant stood next to and below an individual who struck the glass with what appears to be a small axe. The defendant encouraged the individual by shouting, "Window! Window! Break it!" and clapping. Shortly thereafter, the defendant stood next to and below rioter Mitchell Todd Gardner II, who actively attempted to break the glass of the window of Senate Terrace Mezzanine Room 2 with a canister. The defendant held an object, which was a different canister of chemical irritant, in his right hand.

15. The defendant then nodded to an unknown person who handed him a baseball bat. The defendant turned and attempted to hand the bat to Gardner to assist breaching the window. Gardner refused to take the bat. The defendant then used the same bat to strike the lower portion of the glass window in an attempt to breach the U.S. Capitol Building. Moments later, the defendant successfully shattered the lower glass portion of the window. He then turned to face the crowd and clapped and shouted in an act of encouragement for people to start entering the

U.S. Capitol Building through the window. According to the Architect of the Capitol, the repair to the window outside Senate Terrace Mezzanine Room 2 cost $2,388.

16. Soon after, many people, including the defendant, entered the U.S. Capitol Building by crawling through the window that the defendant had shattered. Open-source videos and cell phone videos captured by the defendant and other rioters who entered Senate Terrace Mezzanine Room 2 show the defendant unlawfully present within that U.S. Capitol Building room.

### *Elements of the Offense*

17. The defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with any person designated in 18 U.S.C. §1114 while engaged in or on account of the performance or their official duties.

18. Specifically, the defendant admits that he sprayed a chemical agent toward officers of the Metropolitan Police Department, including L.H. and C.W. When utilized in this manner, the chemical spray was capable of causing death or serious bodily injury and, at the time he sprayed it, the defendant intended to cause bodily injury.

19. The defendant further admits that when he assaulted the officers with chemical spray, he knew that the officers were engaged in the performance of their official duties and he assaulted the officers on account of their performance of their official duties.

          Respectfully submitted,

          MATTHEW M. GRAVES
          United States Attorney

By:   */s/ Jordan A. Konig*
      Jordan A. Konig
      Trial Attorney, U.S. Department of Justice

## DEFENDANT'S ACKNOWLEDGMENT

I, Aiden Henry Bilyard, have read this Statement of the Offense and have discussed it with my attorneys. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 10/18/22

Aiden Henry Bilyard
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 10/18/22

Jamie Vavonese
Attorney for Defendant