UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. No. 1:22-CR-00034-01 (RBW) |
| ) | |
| AIDEN BILYARD ) | |
| ) | |

**DEFENDANT'S SENTENCING MEMORANDUM IN SUPPORT OF A VARIANCE**

The Defendant, Aiden Bilyard, together with his attorneys, Jamie L. Vavonese and Gregory S. Smith, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. § 3553 (a), respectfully submit this memorandum to aid the Court at sentencing, and hereby notify the Court that they have received and reviewed the Presentence Report ("PSR") prepared in this case. Mr. Bilyard persists in his factual objections as it relates to the purpose of his visit to Washington, D.C., and the fact that he arrived in Washington D.C. with no weapons of any variety, including home defense pepper gel. It is also submitted that no fine should be imposed in addition to the restitution ordered in this case. These objections do not affect the guideline range, and it is agreed that Aiden Bilyard's base offense level is 23 and his criminal history category is I, resulting in a guideline-suggested imprisonment range of 46-57 months. For the reasons stated herein, the defense respectfully requests that this Honorable Court vary downward from the guideline range, and impose a sentence on Aiden Bilyard of home incarceration, a term of 5 years of probation, community service, and restitution in the amount of $3,500.00.

I.   **Framing An Appropriate Sentence**

As the Court is aware, in framing a discerning judgment upon Mr. Bilyard, Congress has

1

declared that the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of sentencing set out in 18 U.S.C. § 3553 (a)(2). Further, "in determining the particular sentence to be imposed," the Court shall consider the factors set out in 18 U.S.C. § 3553(a)(1) through 7.[1]

### A. Nature and Circumstances of the Offense and History and Characteristics of Mr. Bilyard[2]

At 18 years old on January 6, 2021, Aiden Bilyard appears to be the second youngest person charged with crimes stemming from that day. On that morning, Aiden woke up at his and his mother's home in Cary, North Carolina and decided to drive to Washington, D.C. to see then President Trump speak (hereinafter "Trump"). Aiden had an interest in politics, he had been following the Presidential campaigns, the election, and the news coverage of Trump. During the lead up to January 6, 2021, turning on the television, listening to the radio, reading the newspaper and opening social media, Aiden was surrounded by differing opinions regarding the election, whether it had been "stolen," and what Trump was requesting of his supporters. Aiden thought that hearing the President speak would be historic. Trump was larger than life to Aiden. Aiden believed Trump to be a strong leader, an independent thinker, and a no nonsense man who would stand up for his beliefs even if others disagreed.

Aiden was at a vulnerable stage in his life. He was a kid who played the cello, who made good grades, enjoyed reading and, like most teenagers, wasn't really confident in himself or his direction in life. He was raised only by his mother. He never met his father, and until shortly before January 6, 2021, had no information about him. His mother withheld information from

---

[1] *See* 18 U.S.C §3553(a).
[2] *See* 18 U.S.C §3553 (a)(1).

him about his father until shortly before Aiden turned 18, in part because she did not intend to raise Aiden with his father, and also because when Aiden was just a baby his father kidnapped children he had from another woman at gunpoint, and he was sentenced to a lengthy prison sentence. While his mother's parenting decisions regarding his father were understandable, they left Aiden feeling unconnected, upset with his mother's choices and desperate for a male role model or father figure.

Every day during 2020 and leading up to January 6, 2021, Aiden found Trump and his vocal supporters on his TV, in the newspaper, and on social media. Aiden was enamored with Trump and the characteristics that Aiden believed he espoused. He saw Trump's personality traits as strong male characteristics to be emulated. In many ways Aiden idolized Trump, so when the opportunity to see him speak on January 6th, 2021 presented itself, Aiden drove alone to D.C.

Aiden chose to go to D.C. alone rather than with two acquaintances because in previous group messages the acquaintances were discussing violence and bringing weapons. Aiden went to D.C. with no plan to storm the Capitol, to commit crime or to do anything else nefarious. He wore sweatpants, a sweatshirt and a winter puffer coat. He had no weapons, nor did he have protective gear of any variety. Aiden's purpose for going to D.C. was to see Trump speak.

While at the rally, Trump told the crowd, "And after this, we're going to walk down and I'll be there with you. We're going to walk down- we're going to walk down. Anyone you want, but I think right here, we're going to walk down to the Capitol- and we're going to cheer on our brave Senators and Congressmen and women, and we're probably not going to be cheering so much for some of them." After Trump's speech Aiden followed a large crowd of predominately older males to the Capitol. When he arrived he was still in a large crowd of people. As he moved

closer to the front, he could see altercations between the police and the protestors, and he also heard through the crowd that one protestor had been killed by the police. At some point he was handed a can of bear spray from someone in the crowd. The crowd was being sprayed with chemical agents, and Aiden used the can of bear spray to spray into a line of officers. He wasn't thinking through his actions, or analyzing the pros and cons of doing certain things; instead, he was caught up in the momentum and activity, and followed the crowd.[3] The actions he took were his own in the moment, but they were not actions that were planned in advance.

Aiden moved forward, ending up in front of a window leading to Senate Terrace Mezzanine Room 2. Up on the window sill were adults attempting to break the window, the crowd was cheering, and from the back of the crowd a baseball bat was handed up to Aiden. Aiden tried to give the bat to the person attempting to break the window, but instead of taking it, that man called Aiden up to try to break the window himself. Adults in the crowd encouraged him to break the window. They cheered for him, and Aiden climbed up and broke the window. The crowd continued to cheer and chant when he broke the window. Ultimately, he entered the Senate Terrace Mezzanine Room 2 and stayed in there for a few minutes. As the energy dissipated in the room based on the lack of people and cheers, Aiden texted his best friend who gave him his

---

3  Aiden was an 18 year high school graduate when this happened. As the Supreme Court stated in Miller v. Alabama, after evaluating scientific studies regarding the development of children's brains, the Court explained the neuroscience is "increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." Miller, 567 U.S. 460, 472 n.5 (2012)(internal quotation marks and citation omitted). Previously, the Court in Graham v. Florida, 130 S.Ct. 2011 (2010) stated that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." Id. at 2026. These cases have taught legal scholars 2 things: First, adolescents have diminished decision making capacity due to their impulsivity, proclivity for risk-taking, and deficiency in foreseeing consequences." Graham v. Florida, 130 S. Ct. 2011, 2026-27 (2010) (citing brain research). Second, they are vulnerable to negative external pressures from peers and family to a greater extent than adults, and thus they are less able than adults to escape their social context. Graham, 130 S. Ct. at 2026; Miller, 132 S. Ct. at 2454. The Miller Court insisted that the distinctive features of adolescence that reduce youthful culpability are not crime specific-they are as relevant to homicide as to non-homicide offenses. Id. at 2465.

first dose of reality from someone who knew and cared about him. His best friend Ethan told him he needed to leave. Aiden listened and left the building.

Aiden drove back to Cary, North Carolina, and in the days and weeks following January 6, Aiden evaluated his actions and made changes not only to the way he thought, but also regarding his plans for the future. He felt misled, upset and disappointed by his own actions. He, like almost any teenager who has made a bad decision, spent a lot of time thinking about what happened and his part in it. He wanted to do better, and to make himself proud, so he communicated with a recruiter for the Air Force and enlisted. He left for basic training eight (8) months after January 6, ready to begin the next phase of his life.[4]

When he was discharged only five (5) weeks into basic training because of the instant offense he was devastated.[5] Upon arriving home, he was embarrassed when he thought about his actions on January 6. He was mortified and disappointed that his behavior would be on display for everyone who knew him to see on the news and or read about online. He was embarrassed that he let his mother down, but most importantly he was embarrassed that he let himself down.

Unlike when Aiden was trying to find his way to be a man by watching others like Trump, after he came home from basic training Aiden learned first-hand the more admirable qualities of being a man - acceptance of responsibility, bravery, the ability to communicate, the need to be respectful, and to admit when you are wrong. Aiden has willingly honed each and every one of these characteristics since he was sent home from basic training in August of 2021.

Aiden immediately took responsibility for his actions on January 6. He cooperated with law enforcement, and he voluntarily provided his cell phone to be searched. He debriefed and

---

4 *See* DD214.
5 *Id.*

admitted his wrongdoing, as well as providing information about other individuals. Instead of avoiding people and places because he was embarrassed, he got a job as a server and, even when his face was plastered on the news, he continued going to work.[6] He was a model employee, he worked hard, he was kind, and his new work family appreciated him.[7]

When he recognized that he would be charged with felony and misdemeanor charges, and later when he heard your Honor say that he would need to go into custody while awaiting sentencing, he was brave. He was by then a 20 year old, now recognizing and appreciating his good background and solid support system of friends and family. Before the five (5) weeks he was at basic training, Aiden never lived away from home. His first real away-from-home living experience on his own wasn't like most kids his age at college; instead, it was in the Alexandria Detention Center, surrounded by persons accused of all sorts of (often very serious) crimes. Since then, Aiden has been on 22-hour lockdown for the last six (6) months while in custody. The lockdown has been torturous for him. He nevertheless has taken advantage of this forced solitude to come to understand more keenly than most adults the need to be punished for what he did, and he was then, and is now extremely remorseful for his actions.

Aiden has grown up immeasurably in the two (2) years since these events. He has learned hard and valuable lessons. He knows that he was wrong for the part he played in January 6, and he has accepted responsibility for his actions since the very beginning.

### B. The Kinds of Sentences, and the Sentencing Range Established by the United States Sentencing Commission.[8]

Aiden faces a Sentencing Guidelines-recommended term of imprisonment in the range of

---

6 *See* Letters from Employers.
7 *Id.*
8 *See* 18 U.S.C 3553 (a)(4).

46-57 months.[9] Of course, the Supreme Court has ruled that the punishment guidelines set out by the Commission are entirely advisory, so that range of punishment is simply one factor to be considered.[10] Congressional enactment, as opposed to the administrative guidelines from the Sentencing Commission, however, has authorized a less stringent punishment for Aiden's offense of conviction: Probation of not less than 1 year or more than 5 years.[11]

Thus, on the one hand, the Commission advises punishment by a term of active imprisonment, while, on the other hand, Congress authorizes punishment by probation. Even though the statutory maximum that may be imposed is 20 years imprisonment,[12] because undersigned counsel is unaware of anything that might warrant a sentence greater than the most severe punishment advised by the advisory guidelines by the Sentencing Commission, it is respectfully submitted that one (1) year of probation and 57 months' imprisonment are the realistic outer limits of punishment that may be "sufficient, but not greater than necessary," to impose on Mr. Bilyard.

In choosing between those two extremes, this Court is required to consider other factors set out in 18 U.S.C. § 3553 (a). Of course, the Court need not march through a rote parroting of those factors, and counsel need not drag the Court through such a recitation.[13] The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence and incapacitation, Here, Mr. Bilyard has already been punished in numerous ways, some of which

---

9 *See* PSR ¶ 75.
10 *See United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738,757,160 L.Ed.2d 621 (2005). ("Guidelines effectively advisory").
11 *See* PSR ¶ 84.
12 *See* PSR ¶ 74.
13 *See* United States v. Eura, 440 F.3d 625, 632 (4th Cir. 2006)(agreeing with statement, "true that the district court did not march through §3553(a)'s sentencing factors, but we have never imposed such a requirement")(internal citation omitted), rev'd on other grounds, 552 U.S. 1090 (2008).


will continue throughout the remainder of his life. He now has a federal felony conviction as a 21 year old, which will impact his ability to go to college, and to get a good job, among other things. He joined the Air Force, but because of this arrest he was discharged, and any future military career is likely now impossible. His actions have placed him on the news in every living room, not only in his home city in North Carolina, but in the entire country, with many having lumped him together with right wing extremists. The extensive information that is on the internet about him will surely follow him for the rest of his life. Finally, and most importantly, he has been incarcerated for six (6) months in a facility requiring 22-hour lockdown. Solitary confinement can have long term traumatic effects on adults who are subjected to it, but on young adults or children, whose brains are still developing, those effects can be even worse.[14] Solitary confinement can cause or exacerbate mental health problems.[15] Isolation for such long periods of time may cause suicidal thoughts or hallucinations as the person tries to cope with the experience.[16] Aiden has struggled with his demons during his incarceration, not only because his freedom has been taken, but also from the unusual 22-hour lockdown imposed. The impact of both of these circumstances, as well as the stress of the case and being away from his support system, have already punished him immeasurably.

As to specific deterrence, Aiden's likelihood of recidivism has been professionally evaluated as low.[17] He has expressed his genuine remorse for his conduct and accepted responsibility for his actions immediately. He has zero criminal history. His conduct post-January 6 and prior to his arrest, as well as post arrest-and prior to his guilty plea, also indicate

---

14 S*ee* Young People in Solitary Confinement, https://www.juvjustice.org/blog/1374 (April 20, 2022).
15 *Id.*
16 *Id.*
17 *See* Dr. Carole T. Guinta Pyschological Report, at p.6.

that his proclivity to commit crime just does not exist. In addition, research has shown that increases in severity of punishment do not yield significant (if any) marginal deterrent effects.[18] Most importantly, as Dr. Guinta stated in her report, "Aiden is an impressionable young man whose identity is not solid, and who is searching for direction and approval from older men. As such, he remains vulnerable to following others and is at risk for seeking status and identity by attaching himself to men in prison who embrace violent attitudes. This concern could be addressed by sending him to local time or home confinement."[19]

A punishment of additional prison time in this case would have the exact opposite effect from what is in the interest of justice. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice. Undersigned counsel respectfully submits that a sentence below the guideline range is "sufficient, but not greater than necessary, to comply with" the purposes of punishment. The term of active incarceration that Mr. Bilyard has served already has imposed a serious deprivation of his liberty and reflects the seriousness of the offense, promotes respect for the law and provides a just punishment – i.e., a punishment that "fits the crime"—and it also affords adequate deterrence to other similarly situated persons who may be tempted to take the same course of action as Mr. Bilyard. Second, the proposed sentence will "protect the public from further crimes of" Mr. Bilyard, which Dr. Giunta describes as unlikely.

### C. Conclusion

The non-guideline sentence contemplated above is reasonable in light of Congress's instructions to consider the history and characteristics of Mr. Bilyard and the circumstances of his

---

18 Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).
19 *See* Dr. Carole T. Guinta Psychological Report, at p.7.

offense, the kinds of sentences available, as authorized by Congress, the punishment range established by the Sentencing Commission, and the purposes of punishment.  Moreover, because of those considerations, even if it were to show some disparity from other defendants, it is respectfully submitted that any such disparity would not be unwarranted[20] in this particular case. Such a non-guideline sentence is sufficient to comply with Congress's purposes in punishing offenders and would, in the final analysis, embody a discerning, life sustaining exercise of this Court's discretion and judgment.

Wherefore, on the basis of the preceding facts, arguments, and authorities, and the factual information set out in the Presentence Investigation Report, the Defendant requests the following relief:

a. That the Court impose place Mr. Bilyard on home confinement for a period in the court's discretion;

b. That the Court place Mr. Bilyard on probation for 5 years

c. That the Court impose a restitution order, as set out in the Presentence Investigation Report;

d. That the Court impose upon Mr. Bilyard a special assessment in the amount of $100.00 due and payable immediately;

e. That the Court find that Mr. Bilyard is unable to pay a fine;

f. That the Court grant such other and further relief as is just, proper, and reasonable.

Respectfully submitted, this the 14[h] day of March, 2023.

By:   /s/ Jamie L. Vavonese

---

20 *See* 18 U.S.C. §3553 (a)(6).

Jamie L. Vavonese
NC State Bar No. 34264
VAVONESE LAW FIRM, PC
PO BOX 1656
Raleigh, NC 27602
(919) 833-7454
(919)833-7457 (Fax)
jlv@vavolaw.com

/s/ Gregory S. Smith

Gregory S. Smith
Law Offices of Gregory S. Smith
913 East Capitol Street, SE
Washington, DC 20003
(202) 460-3381
(202) 330-5229 (Fax)
gregsmithlaw@verizon.net

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 14th day of March, 2023, the foregoing Defendant's Sentencing Memorandum in Support of a Variance was served through the electronic service function of the Court's electronic filing system as follows:

This the 14th day of March, 2023

                        By:    /s/ Jamie L. Vavonese
                                 Counsel for Aiden Bilyard